[Civ. No. 29270. Second Dist., Div. Three. May 19, 1967.]

AXEL SCHOENBERG et al., Plaintiffs and Respondents, v. ROMIKE PROPERTIES et al., Defendants, Cross-complainants and Appellants; JACK CASEY et al., Defendants, Cross-defendants and Respondents.

[Civ. No. 30531. Second Dist., Div. Three. May 19, 1967.]

AXEL SCHOENBERG et al., Plaintiffs and Respondents, v. LEN ROY KOUTNIK et al., Defendants and Appellants; MARY ELLEN BENNER, Defendant and Respondent.

(Consolidated Cases.)

F. Walter French and Ervin M. Roeder for Defendant, Cross-complainant and Appellant Romike Properties.

Paul D. Holland for Defendant, Cross-complainant and Appellant Benner.

Charles S. Leeds and Robert M. Maslow for Defendants and Appellants Koutnik.

156

Thomas Reynolds and John D. Gray for Plaintiffs and Respondents.

No appearance for Defendants, Cross-defendants and Respondents.

SHINN, J.*—In this action Axel and Mildred Schoenberg were awarded $117,500 as damages for fraud and negligence in the sale of plaintiffs' real property to Jack Casey and wife Hilda. The judgment was against the Caseys, against Romike Properties, a corporation, a real estate broker, and George Albert Pratt, Mary Ellen Benner and Pauline Bell Witte who were salesmen of Romike Properties in its brokerage business. In addition plaintiffs were awarded judgment of $7,500 against Romike Properties, which the broker had received as a commission. Only Romike and Benner appeal from the judgment.

After entry of the judgment, upon application of plaintiffs, an order was issued directed to Len Roy N. Koutnik and Barbara Koutnik to show cause why they should not be joined as defendants; after a hearing they were ordered joined and subjected to the same judgment liability as Romike. The basis for this order was that the corporation was the *alter ego* of the Koutniks. Len and Barbara Koutnik appeal from the order. It will be appropriate to dispose of the separate appeals in a single opinion.

Romike Properties, Pratt, Mrs. Benner and Witte filed a cross-complaint against the Caseys for indemnity in the amount of any judgment plaintiffs might recover against them. The judgment denied a recovery on the cross-complaint. This feature of the judgment is reviewable on the appeal of the cross-complainants from the judgment.

The Caseys filed a cross-complaint against the Schoenbergs seeking damages for their alleged fraud and failure of consideration. The judgment denied recovery on the cross-complaint and the Caseys have not appealed.

By the pretrial proceedings and the uncontradicted evidence the following facts were established: Plaintiffs owned a spacious home in a section of the San Fernando Valley referred to as Encino. It was operated as a rest home. It was free of encumbrance and was valued in the transaction at $127,500. It was listed for sale for $135,000 with Romike and

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

was sold through that broker to the Caseys. Casey and wife owned a property on Maple Avenue in a section of Los Angeles long since abandoned to "skid row" buildings and other unproductive use. The building, which was constructed in 1908-1910, was known as the Old Labor Temple and was encumbered by a first trust deed of $169,000.

In January 1962, through an escrow, plaintiffs received $20,000 in cash, of which $10,000 was on account of the purchase price of their real property and $10,000 was the price paid for their furniture. They also received the note of Casey and wife for $117,500 payable at $1,250 per month for 7 years, when the unpaid balance would become due, and a trust deed, as security for the note, upon the Casey property in Los Angeles, subordinate to the existing trust deed encumbrance of $169,000. From the sum received by plaintiffs they paid Romike a commission of $7,500 as their broker. Casey made no payment on his note, defaulted in payments on the first encumbrance on the Los Angeles property and it was lost on a foreclosure sale. The second trust deed was obliterated. Casey did not put any money into the purchase of plaintiffs' property. Through the escrow he received $75,000 from a savings and loan association secured by the note of himself and wife and a trust deed on the Encino property.

Upon consummation of the transaction plaintiffs received for their home and furniture a net amount of $12,500 and a worthless trust deed for $117,500; Casey received title to the property of plaintiffs and about $55,000 in cash, for which he gave to plaintiffs only the note and the second trust deed. By its findings and conclusions the court determined that this extraordinary transaction would not have been consummated without the active participation of the defendants Pratt, Benner and Witte.

The complaint was in six causes of action. It was alleged that for more than five years a close business and friendly relationship existed between plaintiffs and Mary Ellen Benner and that she and defendants Pratt and Witte enjoyed the full trust and confidence of plaintiffs. It was alleged that the defendants represented to plaintiffs: (1) That the Casey property had an actual value of $895,000 although its actual value did not exceed $150,000; (2) a second trust deed for $117,500 in the Casey property would be ample security for that amount; (3) that Jack Casey was a prominent and wealthy business man, the owner of large properties and a man of excellent credit and financial standing, and (4) plain-

tiffs relied upon the said representations, and the advice, information and assurances of the agents and were persuaded thereby to sell their property to Casey.

A confidential relationship between plaintiffs and the salesmen existed by virtue of the employment of Romike as plaintiffs' broker. No issue was created by the pleadings as to the consideration plaintiffs received for their property. Therefore, the court was required to determine whether the defendants were guilty of the several acts alleged in the complaint as the elements of the charge of fraud and negligence. Thus, it was the duty of the court to make findings upon four ultimate factual issues. Appropriate findings would have been: (a) That the salesmen misrepresented the value of the Casey property; (b) that in violation of their fiduciary and contractual duties the salesmen represented to plaintiffs that a second trust deed on the Casey property would be ample and safe security for $117,500; (c) the salesmen were negligent in the performance of their duties as plaintiffs' agents, and (d) that plaintiffs were deceived and damaged thereby.

It was the duty of plaintiffs' attorneys to prepare for the assistance of the trial court and for the record, findings upon the ultimate factual issues. Apparently unaware of the fundamental rule that findings should be confined to the determinative factual issues, the findings as prepared by the attorneys consist almost entirely of a recital of the evidence. They occupy 11 closely typed pages of the clerk's transcript.

The findings consist of 40 separate, numbered paragraphs. They amount to a condensed statement of the reporter's transcript. To make the matter even more confusing, additional or duplicating findings were made by reference to 17 paragraphs of the complaint and to 15 paragraphs of other pleadings. Poring through this mass of superfluous verbiage we have been able to discover sufficient findings upon the ultimate factual issues to support the judgment. A check of the 32 findings which adopt paragraphs of the pleadings discloses a number of obvious mistakes. The practice is a poor substitute for findings of ultimate facts and frequently results in conflicting and inconsistent findings, and other errors. The practice also imposes an undue burden upon the reviewing court.

We do not imply that the trial judge should have discarded the findings proposed by the attorneys and drafted his own. The busy trial judge has a right to expect that the attorneys will prepare suitable findings. If his confidence is misplaced

he runs the risk of a reversal. Fortunately the errors we have discovered do not affect the general result.

Having determined that the judgment is supported by the findings we turn to the next question on the appeal, namely, whether the findings have support in the evidence.

The brief of Romike asserts there was no evidence that the salesmen made any representation as to the value of the Casey property, or used any pressure upon plaintiffs to induce them to sell their property to Casey. The brief contains no statement of the evidence upon these issues. The obvious reason for this fatal omission is that a fair statement of the evidence would defeat the attack upon the findings. The blunt statement by Romike of the absence of evidence to support the findings merits only an equally abrupt denial. As to Romike we shall consider only the contention that the representations, if made, were mere statements of opinion.

In the brief of Mrs. Benner it is contended that she did not personally make any representation as to the value of the Casey property, was not guilty of negligence or breach of duty, and that the findings and conclusions of the court to the contrary were without support in the evidence. Mrs. Benner contends also, as does Romike, that if any representations as to value were made they were mere expressions of opinion and not actionable. Unfortunately, we cannot agree with her contentions.

Upon the basis of sufficient expert testimony the court found that the Casey property had a value of $85,000 and the finding must be regarded as conclusive.

The idea of inflating the value of the Maple Avenue property to 10 times its worth originated with Casey several months before his transaction with the plaintiffs. His scheme was to get an appraisal, not on the basis of actual value, but upon the basis of an assumed cost of reproduction, less depreciation, over a period of more than fifty years. Casey intended that the figure thus arrived at would be represented in the appraisal as the present value of the property.

Casey obtained from Allied Property Analysts a written appraisal of his property which on the first page of a verbose document stated that the property had a value "as indicated by the reproduction cost approach [of] EIGHT HUNDRED NINETY-FIVE THOUSAND DOLLARS ($895,000)." The appraisal assumed a reproduction cost of the 50-year old building of $1,418,000, a depreciation of 40 percent, and appraised the value of the building alone at $850,000. The appraisal made

vague reference to remodeling of the building, without stating the nature or cost of it, and again gave it a value of $895,000, assuming the completion of the remodeling program. It was a completely false and deceitful representation of present value.

The cost of reproduction was a false basis of evaluation of the property. Location was the controlling factor. The appraisal was a representation that the building (somehow remodeled) would have a value of $895,000 although located upon a $45,000 lot in a slum area. The expert testimony was that the best use of the property would be as a parking lot and that the building had no value whatever.

Casey gave the appraisal to Witte, who gave it to Pratt, who took it to plaintiffs and left it with them for a day or two. They discussed an offer of Casey of $125,000, which plaintiffs refused. Mrs. Benner was present during this meeting. The conduct of Pratt and Mrs. Benner in the meeting and the conduct of the three agents thereafter in connection with Casey's offer of $127,500 was the foundation of their liability and the liability of Romike. The court found that Mrs. Benner for a number of years had been a close social and business friend of plaintiffs, had given them business advice as requested, had sold them the lot on which they built their house and enjoyed their full trust and confidence. These findings have support in the testimony of Pratt, Mrs. Benner and plaintiffs, and they are not challenged.

The court found that Pratt and Benner took Casey's appraisal to the Schoenbergs, exhibited it to them and represented to plaintiffs that the Casey property was worth more than $800,000, that plaintiffs could not go wrong by selling their property to Casey with a down payment of $10,000 and a second trust deed on the Casey property of $117,500. The Schoenbergs testified that Pratt made the representation as to value in the presence of Mrs. Benner and that Mrs. Benner did not express disagreement with the statement but, upon the contrary, stated to plaintiffs that they were fortunate in being able to sell their property. Pratt also caused a statement to be placed in Casey's escrow instructions that the building was seven stories and appraised at $895,000.

It is true, as Mrs. Benner asserts, that there was no evidence that she made any statement as to the value of the Casey property, but we cannot say, in contradiction of the court's finding, that her conduct did not amount to a representation that the property was worth what Pratt said it was

worth. The significance of her conduct was to be gauged by the effect it would have upon plaintiffs. She remained silent when Pratt made the oral representation and she urged plaintiffs to consider Casey's first offer of $125,000, which implied that she considered it to be a fair offer. The finding that Mrs. Benner represented the property to be worth $800,000 implies that the court believed that her conduct was understood by the plaintiffs to mean that she agreed with Pratt's representation as to the value of the Casey property and the fairness of Casey's offer. In view of the relationship between Mrs. Benner and the Schoenbergs it was reasonable for the court to find that Mrs. Benner caused plaintiffs to believe that she agreed with Pratt's representations.

The court also found that Mrs. Witte represented to plaintiffs that the Casey property was worth more than $800,000, that a second trust deed on the property would be better security than a trust deed on the property plaintiffs were selling; that the value of the Casey property would be worth twice the amount of the encumbrances that would be against it, that the Casey offer was a good one and plaintiffs should accept it, and she also represented Casey to be a prominent and wealthy man, financially responsible and reliable.

The court found, inferentially, that Pratt, Benner and Witte, had no knowledge of the value of the Casey property. The evidence was that they had none. The court also found, specifically, that the "brokers [agents] made no inspection or investigation of the Casey property, or the income therefrom, or the credit standing of the Caseys, or the value of the property, and that they made their representations of value and that it was a 'good deal' . . . without a reasonable belief based on adequate facts to make such representation." There was no evidence that the agents had any information, other than that provided by the appraisal, of the character, location or surroundings of the Casey property and no evidence that they had any knowledge as to Casey's wealth or responsibility. Mrs. Schoenberg testified that the agents kept her under great pressure to make the deal and that it was their representations and advice which caused her and her husband to sell on Casey's terms. She also testified that she told Pratt and Benner she did not understand the appraisal and that when it was suggested that she look at the Casey property she said they (plaintiffs) could not look at it, and that if she looked at it she would not know what it was worth. It was

clear from the evidence that plaintiffs were convinced of the value of the Casey property, not by the appraisal, but by the representations of the agents.

 The representations of the agents were not, as appellants contend, mere statements of opinion. They were speaking as experienced operators in real estate with a knowledge of such values superior to that of the Schoenbergs. As agents of the latter it was their duty to make any investigation of the Casey property that was necessary in order to learn its value. Plaintiffs could reasonably have believed that the agents had made any necessary investigation and had become satisfied that the property had a value of $800,000. The assertion of value was made without reasonable ground for believing it to be correct. It was a false statement and even though uttered without fraudulent intent was one which imposed liability upon the agents for the legal consequences. Moreover the agents concealed from plaintiffs the fact that they had no knowledge whatever of the value of the property. Even though, in their ignorance, they may have believed the sale would be to the advantage of plaintiffs their gross neglect of their duties as fiduciaries (*Langford* v. *Thomas,* 200 Cal. 192 [252 P. 602]), to act in the utmost good faith and to refrain from the slightest false statement or concealment which would reasonably influence the judgment of their principals rendered them guilty of constructive fraud. (Civ. Code, § 1573.)

In view of the existing confidential relationship and the superior knowledge of the agents, plaintiffs had a right to rely upon the statements and recommendations that were made to them, and had no duty to make an independent investigation. (*Sime* v. *Malouf,* 95 Cal.App.2d 82 [212 P.2d 946, 213 P.2d 788].)

 The fact is that when the agents learned of Casey's offer they switched their allegiance to Casey and bent all their efforts toward obtaining the acceptance by plaintiffs. The mildest criticism of this conduct would be that it constituted culpable negligence. (*Gagne* v. *Bertran,* 43 Cal.2d 481 [275 P.2d 15].)

By reference to one paragraph of the complaint the court found that all the alleged acts of the defendants, whether of commission or omission, were with an intent to deceive and defraud plaintiffs. We believe this finding was the result of inadvertence. It is inconsistent with the very thorough discussion of the evidence in the court's opinion, with the court's

conclusions of law, and, we think, without support in the evidence. However, the finding is not essential to the judgment, which has support in other findings of constructive fraud and negligence. The agents were the foils of Casey. They evidently had not encountered a similar financial wizard and were dazzled by Casey's pretentions of wealth and reliability. The testimony of the late Mr. Pratt was illuminating. Casey had borrowed from a savings and loan association by trust deed on the Maple Avenue property $175,000 and owed a balance of $169,000. Mr. Pratt did not believe a savings and loan association would make a loan of more than 50 percent of the value of the property. This indicated to him that the property was worth not less than $350,000. But Pratt did not know Casey. Considering Casey's takings from the loan company and from the Schoenberg deal, it would be a good guess that if the Sphinx is ever sold for its replacement cost, less depreciation, the seller will be a man named Jack Casey. Small wonder that Casey struck out for parts unknown, leaving the defendant agents to bear the burden of his fraud. But the fact that the agents were among Casey's victims cannot affect the rights of plaintiffs to compensation for their loss.

As previously stated, Romike and the other defendants sued Casey and wife upon a cross-complaint for damages, alleging they were deceived by the fraudulent representations of Casey and seeking reimbursement in case they should be held liable to plaintiffs. The court found that the cross-complainants did not rely upon the representation of the Caseys and that by the slightest investigation they could have learned that the Casey property was worth less than $100,000, and that the trust deed given plaintiffs was worthless. The judgment was in favor of the cross-defendants. The cross-complainants have not shown any reason for questioning the correctness of the findings and judgment upon the cross-complaint. The court found that the representations they made to plaintiffs were their own, for which Casey was not responsible.

The judgment must be affirmed.

We come now to the appeal from the order which determined that plaintiffs may look to Len and Barbara Koutnik for recovery of their loss.

Upon the appeal of the Koutniks from the order joining them as defendants and imposing upon them liability equal to that of the corporation, Romike, three grounds are asserted for reversal of the order. We consider first the contention that the trial judge was disqualified to make the order.

■ Appellants attack the order adding them as judgment debtors on the ground that the order is void because the trial judge who made it should have, instead, disqualified himself. The trial judge ruled at the hearing of the order to show cause on October 8, 1965, in response to appellants' counsel's statement at the said hearing that appellants "have filed an affidavit of prejudice under section 170.6 of the Code of Civil Procedure,"[1] that such affidavit "comes too late" and ordered it stricken from the file on the court's own motion.

In so doing the trial court acted correctly. Appellants' affidavit of prejudice had been filed on July 7, 1965. But subdivision (2) of section 170.6 of the Code of Civil Procedure requires not merely the filing of such an affidavit of prejudice, but as well, an oral or written motion without notice, supported either by such an affidavit of prejudice or by an oral statement under oath to that effect. More specifically, where the judge assigned to or who is scheduled to hear the matter is known at least 10 days before the date set for hearing the matter, such motion shall be made at least five days before said date of hearing. (Code Civ. Proc., § 170.6, subd. (2); *People* v. *Roerman,* 189 Cal.App.2d 150, 164-165 [10 Cal.Rptr. 870]; *People* v. *Martinez,* 232 Cal.App.2d 796, 800-801 [43 Cal.Rptr. 197].) If the motion is directed to a hearing (other than the trial of a cause) the motion must be made not later than the commencement of the hearing.

A motion is an application for an order. (Code Civ. Proc., § 1003.) No such application was ever made by appellants, either in writing or orally, at any time, notwithstanding the fact that they knew from June 22, 1965, or earlier that Judge Diether was assigned to and was scheduled to hear the matter.[2] For the foregoing reasons his action of striking the affidavit of prejudice from the files was correct.

---

[1] Appellants' counsel later said they "intended to assert an affidavit of prejudice for cause." We believe counsel misspoke himself. His affidavit is headed "Affidavit of Prejudice against Parties, Proposed Parties, their Attorneys and their Interest under C.C.P. 170.6" and its language in its last paragraph is in substantially the form required by subdivision (5) of that statute. On the other hand, its averments state no fact or facts constituting any ground of disqualification of Judge Diether and do not meet the requirements of Code of Civil Procedure, section 170, subdivision 5. (*Oak Grove School Dist.* v. *City Title Ins. Co.*, 217 Cal.App.2d 678, 702 [32 Cal.Rptr. 288].)

[2] The superior court file in the case, which we ordered pursuant to rule 12(a) of the Cal. Rules of Court, shows in the minutes of the first hearing on the order to show cause, held on June 22, 1965, that appellants were personally present; that Judge Diether presided at that hearing and laid down ground rules for the trial of the matter by affidavits and briefs, and ordered Len Koutnik and Barbara Koutnik to deliver the corporation

The next argument of appellants is headed: "Absent a fraud or injustice to a particular aggrieved undercapitalization and unity of interest are not absolute grounds for disregarding a corporate entity." True; but they are important factors to be considered.

The hearing on the order to show cause was upon the declaration and supplemental declarations of John D. Gray, plaintiffs' attorney, and the declaration of Mary Ellen Benner in support of the order to show cause, and the declarations of Julius Bovill, Barbara Koutnik, Len Roy Koutnik, Robert L. Lawton and Marianna Smith, in opposition to the order.

By the declarations the following facts were established without conflict: Plaintiffs have collected from Jack Casey and wife on account of the judgment about $11,415.58; Jack Casey cannot be located; no property of Jack Casey and Hilda can be found to be subjected to the judgment; George Albert Pratt is deceased and his estate is insolvent; Pauline Belle Witte is without substantial assets; Mary Ellen Benner has assets of value equal to the amount of the judgment. Romike Properties, doing business as R.F.D. Real Estate, was organized in 1956 with a capital paid in by Koutnik of $1,000; it has no fixed assets in excess of that amount; it has never declared a dividend; Len Koutnik always has been president of the corporation; Barbara is secretary and has authority to sign checks of the corporation; Len and Barbara Koutnik and Marianna Smith constitute the board of directors; Koutnik and wife own all the stock of the corporation; Len Koutnik manages and controls the operations of the company; Koutnik has no contract salary payable by the corporation; he withdraws money whenever he chooses, if it is available; for the year ending March 31, 1963, he drew $35,000; the same amount the following year and the next year $20,000. Koutnik owns a converted herring trawler and a 35-year-old sloop, both of unstated value; at times Koutnik has loaned money to the corporation and at times has waived his commissions; he also borrows money from the corporation. Koutnik is a stock-

minute book, general ledger, journal and ledger pages regarding the accounts of Len Koutnik or Barbara Koutnik or both to the office of plaintiffs' counsel, John D. Gray, on July 5, 1965. The court also made an order enjoining appellants from disposing of any of their property except on order of the court after five days notice to other counsel. Appellants were given permission by the court to file a corporate surety bond in the amount of $100,000 in lieu of the restraining order. Appellants were ordered to return on August 31, 1965, at 9 a.m. without further order or subpoena.

holder in a Jamaica corporation; Romike has loaned money to that corporation on an interest-bearing note; when the corporation is authorized to sell its land in Jamaica, Romike will have an exclusive agency. The Koutniks own the property on which the business is conducted; the corporation as a licensed broker has been doing a substantial business; in 1964 it paid its salesmen, including Koutnik, $77,000 as commissions, and in 1965, $60,000. In 1964 Koutnik received from other sources over $200,000.

Many of the statements in the declarations of Mr. Gray were of facts testified to by Mr. Koutnik when he was being examined as a judgment debtor in an effort to collect the judgment, and also of information from the records in the office of Romike. Among these statements were the following: Monthly operating expenses of the company were between $3,000 and $6,000 but could run as high as $20,000; in 1964 the corporation owed Koutnik $35,000 and paid the debt after the judgment herein was rendered. Koutnik owns two yachts; in 1963 the corporation paid Ron Riley $2,000 and in 1964, $1,095.74 for something done on the boats, and additional sums for boats. Other payments were made by the corporation to a drug store at Newport Beach, a department store, Muller Brothers Ranch, National Airlines, a clothing store, the Kona Kai Club in San Diego, the Department of Water and Power, a haberdashery store, shrubs for a personal residence, personal insurance, subscription for a yachting magazine, photos of one of Koutnik's yachts, pharmacy bills, accounts for hardware and paints, groceries, to liquor stores, record stores, various restaurants at Newport Beach, insurance on one of Koutnik's yachts of $1,440, insurance on cars, and accounts owing many other establishments for food and services for the personal use of the Koutniks and for attorneys' fees owing by them. The liquor bills averaged about $300 per month. The declaration of Len Koutnik stated that the expenditures referred to in the declarations of Mr. Gray were either for the benefit of the corporation or payments for his personal benefit which were charged to his account. It was asserted that the yachts were used largely for entertainment of the customers of the business; both Mr. and Mrs. Koutnik maintained personal bank accounts in substantial amounts through which they paid their personal expenses.

It was also stated in the declaration of Koutnik that of the commissions earned by the corporation the sums of $70,707.50 in 1963, $143,668.75 in 1964 and $68,785.81 in 1965 were at-

tributable to his personal efforts, and in those years, respectively, he was paid commissions of $35,000, $35,000 and $20,000, in 1965 he owed the corporation $14,536.23. Other declarations in opposition to the order to show cause merely stated that Romike conducted its business as a corporation, "dba R.F.D. Real Estate."

In summary, the combined facts were the Koutniks' ownership of all the stock of the corporation; the undercapitalization as compared with its operations; Koutnik's complete control of the board of directors and of the corporation's business, assets and finances; the failure of the corporation to pay dividends; and, generally, the use of corporate funds by Koutnik as if they were his own.

Koutnik had no broker's license until after the action was filed against the corporation. The business was not conducted under the corporate name but under the fictitious name "R.F.D. Real Estate"; it could just as well have been conducted under a broker's license issued to Koutnik, personally, without disruption of the organization or interference with its operations; a separate bank account, maintained by Koutnik under a fictitious name, would have served the purposes of the corporation as a channel for the movement of the funds of the business.

When all the conditions under which the brokerage business was conducted are considered, nothing is wanting to enable the court to refuse to recognize the separate identity of the corporation. (*Automotriz etc. De California* v. *Resnick*, 47 Cal.2d 792, 796-798 [306 P.2d 1, 63 A.L.R.2d 1042]; *Associated Vendors, Inc.* v. *Oakland Meat Co.*, 210 Cal.App.2d 825, 836-840 [26 Cal.Rptr. 806].) At the conclusion of the hearing the trial judge stated: "[A]n adherence to the fiction of separate existence of the corporation would, under the facts shown by the affidavits on file, sanction a fraud and promote injustice." We fully agree.

The final contention of appellants is that they could not be held liable under the judgment without either an opportunity to relitigate the issues or a showing that they had had control of the litigation.

In responding to the order to show cause appellant Koutnik asked that if he should be added as a judgment debtor he should be allowed a jury trial in plaintiffs' action for damages. Appellants misconceive the nature of the proceeding under the order to show cause. It is not a method for obtaining a new trial or for attacking the judgment.

The authority under which the court exercised jurisdiction derives from section 187 of the Code of Civil Procedure which reads: "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code."

It is well settled that the authority of the court will be exercised to impose liability under a judgment upon the *alter ego* who has had control of the litigation. (*Thomson* v. *L. C. Roney & Co.*, 112 Cal.App.2d 420 [246 P.2d 1017]; *Mirabito* v. *San Francisco Dairy Co.*, 8 Cal.App.2d 54 [47 P.2d 530]; see also *Minton* v. *Cavaney*, 56 Cal.2d 576, 581 [15 Cal.Rptr. 641, 364 P.2d 473].)

There was no showing below, and there is not the slightest suggestion in the briefs of appellants, that anyone, other than Koutnik, had control of the litigation. Who else had authority to employ attorneys and provide for the expense? Who else was interested in the fate of the corporation? If not Koutnik, who else? Appellants do not say. Manifestly, Koutnik had control of the defense of the action by Romike.

The case was fairly tried, as was the order to show cause and both were correctly decided.

The judgment and the order appealed from are affirmed.

Ford, P. J., and Cobey, J., concurred.

Appellants' petition in No. 30531 for a hearing by the Supreme Court was denied July 12, 1967.