THERMOTHRIFT INDUSTRIES, INC.

v.

MONO–THERM INSULATION SYS-
TEMS, INC., Mono-Therm Industries,
Inc., Insulation Machinery Manufactur-
ing Company, Inc., William F. Craig,
Joseph C. Penka.

No. C–76–0388–L(B).

United States District Court,
W. D. Kentucky,
Louisville Division.

March 27, 1978.

William L. Hoge, III, Donald R. Erler, Louisville, Ky., for plaintiff.

Jerry Abramson, Louisville, Ky., for defendants.

## MEMORANDUM OPINION

BALLANTINE, District Judge.

This matter is before the Court on defendants' motion to dismiss for lack of in personam jurisdiction over each and every defendant.

Plaintiff, Thermothrift Industries, Inc., ("TTI") is a Kentucky corporation engaged in the business of insulation manufacturing. Its principal place of business includes Kentucky and the surrounding states. Defendant, Mono-Therm Insulation Systems, Inc., ("MTIS") is a California corporation which sells machinery used in the manufacture of insulation material. Defendant, Mono-Therm Industries, Inc. ("MTI"), is organized and incorporated under the laws of Delaware, with offices and principal place of business in the state of Washington. Defendant, Insulation Machinery Manufacturing Company, Inc. ("IMMCO"), is also a Delaware corporation with its principal place of business in California. Both MTI and IMMCO were incorporated on April 12, 1976.

The individual defendants are William F. Craig and Joseph C. Penka. Craig, a resident of the state of Washington, serves as Vice-President/Marketing Manager of MTIS and IMMCO, and as Vice-President of MTI. He owns 300,000 shares of stock in MTI (15%), and 150,000 shares of IMMCO stock (8%). Penka, a California resident, is the president of both MTIS and IMMCO, and sole owner of MTIS stock. He owns 833,333⅓ shares of IMMCO stock (46%) and 500,000 shares of MTI (25%). Both men are directors of the three corporations, Penka being the Chairman of MTI's Board of Directors.

## BACKGROUND

This action arose out of the extended negotiations and subsequent contract for the sale of insulation manufacturing machinery. A number of factual issues are disputed by the parties. For example, the plaintiff contends that MTIS had been marketing its products for several years in the Louisville area, and that the solicitation by an MTIS agent resulted in the formation of the purchase agreement which is the subject matter of this litigation. As partial evidence of MTIS' marketing effort, plaintiff presented a "license agreement" between MTIS and Eugene Smith. Smith entered into the agreement on behalf of S&S Painting, a Kentucky corporation. The agreement, dated June 18, 1975, recited that MTIS was "desirous of entering into an agreement with the licensee (S&S) with respect to the manufacture and distribution of Mono-Therm products in Louisville, Kentucky and surrounding area. . . ." (Plaintiff's Exhibit 5).

Thermothrift was allegedly brought into existence at the behest of Smith, who, along with William J. Hickey, attempted to establish a cellulose fiber insulation manufacturing plant in the Louisville area. TTI was incorporated on November 7, 1975, with that purpose in mind. On November 8, 1976, Smith and Hickey signed a written agreement regarding the organization of Thermothrift Industries and preparation for manufacturing operations. Plaintiff asserts that Smith's efforts were part of his arrangement with MTIS to develop a Louisville market. Smith and Hickey agreed, in part, to:

(f) Negotiate "Purchase" and "License" agreements on behalf of TTI with the Mono-Therm group and Wm. Craig in particular . . . . (Plaintiff's Exhibit C)

Hickey became President of TTI, and in that capacity visited the MTIS plant in Salt Lake City, Utah, to inspect the insulation manufacturing machinery. Meetings were held in California between Hickey and MTIS officers Penka and Craig regarding TTI's purchasing such machinery.

In January, 1976, the two corporate parties, TTI and MTIS, entered into a contract, whereby TTI agreed to buy, and MTIS agreed to sell, one complete insulation manufacturing plant. The purchase price was $125,000.00 of which $50,000.00 was paid upon execution of the contract. The contract was signed in Seattle, Washington, by Hickey as President of TTI, and by Penka and Craig as President and Vice-President, respectively, of MTIS.

The original contract required TTI to have a plant site ready to accept delivery at least ten days prior to the designated delivery date. Hickey leased a lot in New Albany, Indiana, as the potential plant site. The plaintiff argues that prior to signing the contract, MTIS did not know that the machinery would be delivered to New Albany, but rather delivered to a site in Kentucky.

While the parties have been at odds on most factual matters, it has been established that both Penka and Craig came to Kentucky after the purchase agreement had been signed. Penka visited Louisville once, in February, 1976. His affidavits of record are somewhat unclear as to his reasons for coming to Louisville, but his activities with Hickey included the following: (1) traveling to New Albany to inspect the plant site; (2) visiting the Courier-Journal newspaper to discuss MTIS using scrap paper and distributing it to different plants; (3) stopping to talk with Joseph Brenner at Louisville Trust Bank, which was financially involved with the manufacturing plant; and (4) discussing the MTIS working relationship in general terms. Hickey and Penka then flew to Seattle to display machinery to potential investors.

Craig visited Louisville on two occasions, once in February and once in March, 1976. The first trip was to inspect the New Albany plant site and included a discussion with Joe Brenner at Louisville Trust:

(To Mr. Craig)

Q. What did Mr. Hickey ask you to tell him? (Brenner)

A. He asked me to tell him that everything was going okay.

Q. As concerns the distribution of Mono-Therm product and as concerns the machine; is that correct?

A. I assume that that basically is what we discussed. . . .

* * * * * *

Q. Certainly. Did you talk about distributing Mono-Therm product in the area around Louisville, Ky.?

A. We talked about the possibility of what the Louisville plant would be doing after it was built up, yes. (Craig's deposition page 32.)

Craig's second trip was for a convention where he participated as a panel member discussing insulation manufacturing. The plaintiff contends that these trips by Penka and Craig reinforced the contacts and negotiations in Kentucky regarding the purchase agreement with TTI and the continuing relationship between TTI and MTIS through Gene Smith, the MTIS licensee.

On May 5, 1976, MTIS notified the plaintiff that it was unable to perform the contract and offered to return the $50,000.00 deposit. Instead, negotiations were conducted to revise the purchase agreement. Hickey met with Penka and Craig and, supposedly, a new purchase agreement was reached in June, 1976. However, the final draft of this agreement was never signed by Hickey, nor did he acknowledge receipt of the final draft. Thereafter, suit was filed in state court in August, 1976, naming as defendants MTIS, MTI, IMMCO, and Joseph Penka and William Craig.

The complaint alleged three causes of action: breach of contract, fraud, and conspiracy to interfere with the contract. Count I charges that defendants breached the written purchase agreement dated January 7, 1976, in that MTIS failed to produce and deliver the manufacturing machinery as required. Count II alleges that defend-

**402**

ants Penka and Craig made fraudulent representations regarding the operations of an MTIS plant which mirrored the plant to be furnished to the plaintiff. Count III of the complaint alleges that a conspiracy existed among Penka, Craig and certain "unknown defendants" to breach the purchase agreements. An amended complaint was filed asserting jurisdiction over the corporations on the ground "that the acts of these corporations were wholly and completely as an alter ego of the defendant, Mono-Therm Insulation Systems, Inc." Penka and Craig were also charged as individuals as well as in their corporate capacities. Personal service of process was made on all defendants.

The question before the Court is whether or not the defendants are subject to in personam jurisdiction of this Court.

## THE LAW

■ This action was removed from state court pursuant to 28 U.S.C. Section 1441, and involves matters over which the Court has jurisdiction under 28 U.S.C. Section 1332. It is well settled that, subject to the requirements of the due process clause of the Fourteenth Amendment, this Court must look to the law of Kentucky to determine whether there is personal jurisdiction over the defendants. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Davis H. Elliot Co., Inc. v. Caribbean Utilities Co., LTD*, 513 F.2d 1176, 1179 (6th Cir. 1975); *See, e. g., In Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224 (6th Cir. 1972); *Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292, 294 (6th Cir. 1964); *Smartt v. Coca-Cola Bottling Corp.*, 318 F.2d 447, 448 (6th Cir. 1963). Plaintiff argues that Kentucky law provides for jurisdiction over defendants under the Kentucky long-arm statute which reads, in pertinent part, as follows:

"(1) As used in this section, 'person' includes . . . a corporation . . . [which] is a nonresident of this commonwealth.

(2)(a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:

(1) Transacting any business in this commonwealth.

(2) Contracting to supply services or goods in this commonwealth.

(3) Causing tortious injury by an act or omission in this commonwealth.

(4) Causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does solicit business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this commonwealth, provided that the tortious injury occurring in this commonwealth arises out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the commonwealth."

KRS 454.210(1) and (2).

■ In personam jurisdiction must first be authorized by the state legislature in order to exercise jurisdiction over nonresidents. *Elliot v. Caribbean Utilities*, supra, 513 F.2d at 1179; *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 414 (9th Cir. 1977); *Vespe Contracting Co. v. Anvan Corp.*, 433 F.Supp. 1226, 1232 (E.D.Pa.1977). It must also be determined whether the jurisdiction so authorized is consistent with Fourteenth Amendment due process as that concept is delineated in the "minimum contacts" formula of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The principles set forth in *International Shoe* were recently reaffirmed and extended to situations not present in the instant case. See *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

In *International Shoe*, the Supreme Court held that:

". . . due process requires only that in order to subject a defendant to a judgment in personam, if he be not present

within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158.

The questions of legislative authorization and due process merge into one inquiry if the Kentucky Legislature has authorized Kentucky courts to reach to the full constitutional limits in pursuit of non-resident defendants. *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 376 (6th Cir. 1968). The Sixth Circuit has indicated by way of dictum that such approach has been approved by the enactment of the statute considered herein. *Elliot v. Caribbean Utilities*, supra, 513 F.2d at 1180; *Etheridge v. Grove Manufacturing Co.*, 415 F.2d 1338, 1340 (6th Cir. 1969).

■ Three criteria for determining the constitutional limits have emerged from the "minimum contacts" concept of *Int'l Shoe v. Washington*, 326 U.S. at 316, 66 S.Ct. 154:

"First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Southern Machine Co. v. Mohasco Industries, Inc.*, supra, 401 F.2d at 381.

### JURISDICTION OVER MTIS

The plaintiff contends that MTIS had developed numerous substantial contacts with Kentucky: the license agreement with Gene Smith, the contract to supply manufacturing machinery to a Kentucky corporation, receipt of the $50,000.00 deposit drawn on a Kentucky bank, trips to Kentucky by officers of MTIS to encourage investors, and numerous communications between MTIS and the plaintiff in Kentucky. These acts, among others, evidenced a continuing relationship between MTIS and this state.

■ MTIS submits that at no time did it avail itself of the privilege of acting in Kentucky. The defendant's argument fails to recognize the realities of the circumstances leading to the formation and promotion of the contract. The defendant asks that jurisdiction not be extended based on two airplane flights into Louisville and two trips to New Albany. However, a key factor in weighing the strength of this state's connection is whether the cause of action arises out of defendants' attempts to benefit from the laws of Kentucky by entering the market here. *McGee v. Int'l Life*, supra, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; See *United Advertising Agency, Inc. v. Robb*, 391 F.Supp. 626, 630 (M.D.N.C. 1975); *Fieldcrest Mills, Inc. v. Mohasco Corp.*, 442 F.Supp. 424, 428 (M.D.N.C.1977).

■ MTIS committed numerous acts in Kentucky, all of which were freely and intentionally done. The cause of action arose out of those acts. The defendants' involvement with this state, measured by the minimum contacts concept, clearly compels the Court to extend jurisdiction over MTIS. The Court finds that such jurisdiction is not unreasonable, nor does maintenance of the suit "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe v. Washington*, supra, 326 U.S. at 116, 66 S.Ct. at 158. See *Miller Brewing Co. v. Acme Process Equipment Co.*, 441 F.Supp. 520 (E.D.Wis.1977).

### JURISDICTION OVER JOSEPH PENKA AND WILLIAM CRAIG

Both Penka and Craig have been sued as individuals and served pursuant to the Kentucky long-arm statute. Count I of the complaint charges breach of the purchase agreement between TTI and MTIS. Both individuals signed the agreement, Penka in his capacity as president of MTIS, Craig as vice-president. Count II alleges that Penka and Craig made false and fraudulent representations, causing damage to the plaintiff. Count III alleges that both men, as individuals, conspired to interfere with the purchase agreement, again causing damage to TTI.

Defendants, while admitting that they visited Kentucky on behalf of MTIS, deny discussing or negotiating the purchase agreement as individuals, either in Kentucky or elsewhere. Defendants deny the allegations of Counts II and III, and argue that their conduct as individuals does not meet the criteria for "transacting any business" in Kentucky under KRS 454.-210(2)(a)(1). Likewise, their activities, as individuals, do not comply with KRS 454.-210(2)(a)(4) for purposes of Count III. Never did they regularly solicit business or persistently derive substantial revenues as required for personal jurisdiction.

[6, 7] In Kentucky, intentional interference with a known contractual relationship gives rise to an action in tort if the interference is malicious or without justification. *Elliot v. Caribbean Utilities*, supra, 513 F.2d at 1182; *Derby Road Building Co. v. Commonwealth*, 317 S.W.2d 891, 895 (Ky.1958). See also *Industrial Equipment Co. v. Emerson Electric Co.*, 554 F.2d 276, 289 (6th Cir. 1977); *Walt Peabody Advertising Service, Inc. v. Pecora*, 393 F.Supp. 328, 331 (W.D. Ky.1975). Moreover, a corporate officer or agent is personally liable for a tort committed by him although he was acting for the benefit of the corporation. *Elliot v. Caribbean Utilities*, supra, 513 F.2d at 1182; *Small v. Bailey*, 356 S.W.2d 756 (Ky.1962).

The defendants rely on *Weller v. Cromwell Oil Company*, 504 F.2d 927 (6th Cir. 1974), for the proposition that jurisdiction over individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation. In *Weller*, the Ohio plaintiff sought to obtain personal jurisdiction over two corporate officers who allegedly transacted business, contracted to supply goods and services, and/or caused tortious injuries in Ohio. In that case, the affidavits of the individual defendants established that they never engaged in any business in Ohio, and the plaintiff presented no proof to the contrary. No one entered Ohio to negotiate the first contract, and only agents of the corporation, not the individual defendants themselves, visited Ohio to expand the contract's territorial limitations.

■ As distinguished on the facts, Penka and Craig have had sufficiently relevant contacts with Kentucky to invoke the three-pronged test set forth in *Elliot v. Caribbean Utilities* regarding the constitutional limits of personal jurisdiction:

(1) Penka and Craig purposefully availed themselves of the privilege of acting in Kentucky or causing a consequence here;

(2) The cause of action arose from Penka's and Craig's activities in Kentucky; and

(3) The acts of the defendants or consequences caused by them have a substantial enough connection with Kentucky to make the exercise of jurisdiction over them reasonable. *Elliot v. Caribbean Utilities*, supra, 513 F.2d at 1181.

The above tripartite analysis is consistent with the principles of *International Shoe*. Penka and Craig exhibited substantial minimum contacts as a basis for jurisdiction. Due process is also met in that the claim is based on a contract which had substantial connection with Kentucky. *McGee v. Int'l Life*, supra, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223.

## JURISDICTION OVER MTI AND IMMCO

The plaintiff characterizes MTI and IMMCO as sham corporations. In an attempt to develop the "alter ego" status of the two corporations, the plaintiff alleges that they share the same directors, officers, assets, considerations, purposes and business plans with defendant MTIS. As part of a larger conspiratorial scheme, assets of MTIS were allegedly diverted to MTI and IMMCO in anticipation of the contract breach, the breach itself being a part of the conspiracy.

The defendants contend that none of the alleged "alter ego" corporations own shares of stock in any of the other companies. Only Joseph Penka owns shares in all three corporations, and he controls only MTIS. Each corporation has a different president and treasurer, and each board of directors

varies considerably. Therefore, it is argued that no unity of ownership and interest exists to pierce a corporate veil. Further, defendants contend the incorporation of MTI and IMMCO four months after the execution of the contract did not deprive the plaintiff of any remedy against MTIS for breach of that contract.

In applying the "alter ego" doctrine, the Court is concerned with reality and not form, how the corporations operated and the individual defendants' relationship to those operations. *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir. 1976). Kentucky courts have displayed " 'a general aversion for any disregard of the corporate entity.' " *Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 958 (6th Cir. 1976), quoting Campbell, "Limited Liability for Corporate Shareholders: Myth or Matter-of-Fact," 63 Ky.L.J. 23, 48 (1975). Various factors must be weighed and spelled out specifically as to the basis for applying the doctrine. See, e. g., *Hitt v. Nissan Motor Co., Ltd.*, 399 F.Supp. 838, 850 (S.D.Fla.1975) (overlapping board of directors, officers, and significant interchange of personnel).

In Kentucky, a "but-for" test is used to disregard the corporate entity when control of the fictional corporate person achieves a result which would not otherwise have been achieved directly. A corporation may then be liable if its ownership and control deprives the plaintiff of a remedy which he would have possessed but for that ownership and control. *Poyner*, supra, 542 F.2d at 959.

The heart of the "conspiracy" is plaintiff's charge that MTI and IMMCO served as buffers to protect the assets of MTIS should it be held liable for breach of contract. The plaintiff asserts that MTI and IMMCO were also involved in the decision to breach the purchase agreement. Plaintiff further argues that after the breach MTI was the umbrella corporation with whom plaintiff had to negotiate.

The attempts to revitalize the contract were embodied in written proposals entitled "Machinery Purchase Agreement" and "License Agreement" (Plaintiff's Exhibits N and O). The former agreement was between TTI, as buyer, and IMMCO, as seller. The license agreement was between TTI, as licensee, and MTI, as licensor. TTI's address in both instances was listed as 400 Production Court, P.O. Box 99153, Louisville, Kentucky 40299. Both documents were subsequently mailed into Kentucky via Eastern Airlines (Plaintiff's Exhibit P), but were not signed by the plaintiff.

The defendants admit that MTIS will be able to respond to the damage claim if liability is found, stressing the separate identity of each corporation. The following practices support such individuality: separate corporate records, accounting procedures, minute books, board meetings and bank accounts; there is no commingling of funds and all three corporations are solvent; MTIS employs 76 people, only one of which is employed by MTI; none of IMMCO's 46 employees are employed by MTIS or MTI, each corporation files a separate tax return, and no premises are shared by any of the corporations.

Generally, a corporation is regarded as a separate legal entity, distinct from its stockholders, directors and officers. *Gottlieb v. Sandia American Corporation*, 452 F.2d 510, 514 (3rd Cir. 1971), cert. denied 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971). The Court must recognize and uphold this corporate identity unless "specific, unusual circumstances call for an exception." *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967), cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). However, if the idea of separate legal identity is used to justify wrong, protect fraud or defend crime, the law will regard the corporation as an "association of persons." *Anderson v. Abbott*, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793, reh. denied 321 U.S. 804, 64 S.Ct. 845, 88 L.Ed. 1090 (1944); *Dare To Be Great, Inc. v. Commonwealth ex rel. Hancock*, 511 S.W.2d 224, 227 (Ky.1974).

There appear to be a number of unusual circumstances linking the three corporations. Plaintiff has alleged fraud on the

part of Penka and Craig, who together own 100% of MTIS's stock, 40% of MTI's stock, and approximately 54% of IMMCO's stock. The crux of plaintiff's conspiracy argument, however, goes to the initial formation and capitalization of MTI and IMMCO. While these present stock ownership percentages are revealing, the plaintiff contends that they do not reflect the intricate scheme involved herein.

Mr. Noel Lane, corporate secretary of the three companies, was deposed on the jurisdictional question and testified as follows regarding the relationship between the companies:

A. Well, MTI is predominantly a marketing operation, marketing insulation materials, licensing and manufacturing of those insulation materials within the framework of our produce [sic] assurance requirements. MTIS in the relationship now, is— MTIS is a licensee of MTI, producing Mono-Therm materials and that's the way it is. MTIS was the originator of all this, but they are, in fact, a licensee of MTI.

Q. Is IMMCO also a licensee?

A. No.

Q. IMMCO is a totally separate corporation?

A. Totally separate.

Q. And how about the relationship of MTIS to IMMCO? Is there any relationship there?

A. They are just separate. They are separate corporations, MTI produces material insulation . . . IMMCO produces equipment. (Lane Dep. p. 24).

Examination of the companies' present structures reveals common shareholders, directors and officers (See Appendix A).

 IMMCO, though incorporated in April, 1976, had not held a board of directors meeting as of December 10, 1976. None of the three corporations paid any compensation to their directors (Lane Depo. p. 37), and such fact is properly considered in disregarding the corporate shield. See

*GM Leasing Corp. v. United States,* 514 F.2d 935 (10th Cir. 1975), modified on other grounds, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). Likewise, the non-payment of dividends, as here (Lane Depo. p. 43), should be weighed in applying the "alter ego" theory. *DeWitt Truck Brokers,* supra, 540 F.2d at 686; *Schoenberg v. Benner,* 251 Cal.App.2d 154, 59 Cal.Rptr. 359 (1967). Further, the meeting in Seattle on February 25, 1976, was admittedly for the purpose of considering a plan to reorganize MTIS. It is disputed as to whose plan was eventually used but, nevertheless, both MTI and IMMCO were incorporated within two months of the meeting.

The Supreme Court declared in *Anderson v. Abbott,* supra, that fraud provides the most common illustration of the "alter ego" doctrine. Questions at deposition pertaining to the initial capitalization of MTI and IMMCO were consistently objected to by defense counsel, the point of such questions being the denial of a satisfactory remedy against MTIS. The but-for test of *Poyner* can be applied to the charges that the formation, control and ownership of MTI and IMMCO effectively deprive plaintiff of a satisfactory remedy against MTIS for breach of contract. The allegations of fraud must therefore be considered in applying the "alter ego" doctrine to corporate reorganization.

 The legal elements set forth above must be applied in a manner which promotes justice. The Court recognizes the formalities that each corporation has observed, but we cannot close our eyes to the realities of the controversy. The key individuals involved raised common denominators among the three corporations. The similarities between their stockholders, officers and directors, lead to the conclusion that there existed a unity of ownership and interest necessary to pierce this corporate veil. The motions on behalf of MTI and IMMCO to dismiss for lack of personal jurisdiction will therefore be overruled.

An appropriate Order has been entered this date.

## APPENDIX A