Filed 7/23/25  SeneMan v. Corona Industrial JV CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| SENEMAN, LLC et al.<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>CORONA INDUSTRIAL JV, LLC et al.,<br><br>Defendants and Respondents. | D083702<br>D083744<br><br><br><br>(Super. Ct. No.: RIC 1904918) |

APPEAL from a judgment of the Superior Court of Riverside County, Carol A. Greene, Judge.  Affirmed.

Horvitz & Levy, David M. Axelrad, Eric S. Boorstin, Jeremy B. Rosen; Jackson Tidus, Michael L. Tidus, M. Alim Malik and Kathryn M. Casey for Plaintiffs and Appellants.

Grant, Genovese & Baratta, Gordon G. May, Aaron A. Kupchella; Greines, Martin, Stein & Richland, Edward L. Xanders and Marco A. Pulido for Defendants and Respondents.

SeneMan, LLC and GTOK, LLC (collectively, plaintiffs) appeal a judgment in favor of Corona Industrial JV, LLC, Conor Commercial Real Estate, LLC, and LaSalle Investment Management, Inc. (collectively,

developers)[1] following: (1) an order granting the developers' motion for summary judgment against SeneMan and (2) a ruling, in a subsequent bench trial, that the alter ego doctrine bound GTOK to the summary judgment against SeneMan. The plaintiffs contend the trial court erred in granting summary judgment and in denying each of them a jury trial. We conclude the court did not err in denying the plaintiffs a jury trial, and that factual findings the court made in the bench trial render it unnecessary for us to determine whether it erred in granting summary judgment. Hence we affirm.

## I.
## BACKGROUND

**A.    Plaintiffs' Version of Events, as Alleged in the Complaint[2]**

We begin by summarizing certain of the allegations in the complaint. According to those allegations, Conor and LaSalle are companies that buy, develop, and manage real estate. Between 2015 and 2017, Conor and LaSalle developed a site in the City of Corona (the City) that had once been a landfill. As part of that development, Conor and LaSalle erected two industrial buildings atop the site.

But during their development of the site, Conor and LaSalle encountered environmental challenges, which included the discovery of lead contamination from a "battery graveyard." Environmental regulations mandated that a local enforcement agency (LEA)—which in this case would

---

[1]    We hereafter refer to these five parties as SeneMan, GTOK, Corona, Conor, and LaSalle, respectively.

[2]    Our rendition of events in this section of the opinion is derived from allegations of the plaintiffs' first amended and supplemental complaint. We refer to that pleading simply as the complaint, and we express no opinion as to the veracity of the allegations in it.

have been Riverside County's Department of Environmental Health (DEH)—be involved in the development process.[3]  However, Conor colluded with the City to evade compliance with those regulations.  They did so, moreover, despite being told by the City's consultants "that what they were doing—grading and building without [DEH] oversight and approval—was illegal."

By spring 2017, challenges associated with developing and marketing the property had mounted.  Negotiations with two prospective purchasers had broken down. The project was experiencing significant delays and cost overruns.  Executives at Conor had become worried that the environmental contamination would interfere with completion of tenant improvements and issuance of certificates of occupancy for the two buildings.  And "Conor/LaSalle had become desperate to sell the property."

At about this time a cosmetics manufacturer named SeneGence[4] was looking to establish a new manufacturing facility and concluded that the two newly constructed buildings would suit its needs.  Thus it entered into discussions with Conor, LaSalle, and the City.  Also involved in the discussions was SeneMan, a company that "Conor was told . . . would . . .

---

[3]     According to the allegations of the complaint, "California law requires that any development of property that was a former landfill must be reviewed by the . . . LEA," and the "LEA . . . for the Property is the County of Riverside's Department of Environmental Health."  The complaint further alleges that "[t]he City was required to notify the LEA of the Conor/LaSalle development plans and obtain the LEA's approval before issuing any grading or building permits," but that, "[t]o save time, money and potential clean-up liabilities, and to favor Conor/LaSalle, the City simply avoided involving the LEA."

[4]     SeneGence is a company doing business as SGII, Inc. (SGII).  SGII having assigned its claims in this case to GTOK, the parties use the names SGII, SeneGence, and GTOK interchangeably.

3

purchase the Property for the sole purpose of entering into a long-term lease with [SeneGence], who would then use the Property for [its] manufacturing operations."

These discussions led to the execution of two contracts: (1) a purchase and sale agreement (PSA) between SeneMan and Corona (the Conor/LaSalle-controlled entity that owned the property), which provided for SeneMan to acquire the property from Corona in exchange for $30.9 million; and, (2) a commercial lease between SeneMan as landlord and SeneGence as tenant.

"Because the Property was a part of a former landfill, SeneMan and [SeneGence] asked for assurance that the Property was not contaminated and that it could be used for the intended manufacturing purpose without further environmental oversight or concerns." In the PSA itself and during the escrow and due diligence period, they received such assurances. One such assurance was in the PSA itself, which included an "express represent[ation] that there was no violation of any environmental laws related to the Property or the presence or release of hazardous materials on or from the Property." A second such assurance occurred when, "after escrow was opened, and in response to [SeneMan and SeneGence's] need for assurance that the Property was suitable for its intended use, Conor's environmental counsel sent [SeneGence] a letter . . . [representing] that 'no current need exists for regulatory oversight' in connection with any residual materials and that the 'Property conditions pose no currently known threat to groundwater, public health, or the environment.'"

But, unbeknownst to SeneMan and SeneGence, the representations the developers and their agents made (alleged misrepresentations) were untrue, and the developers and their agents concealed and failed to disclose material facts.

4

In due course, escrow closed and SeneMan acquired the property. But it struggled to obtain certificates of occupancy and, as a consequence, ended up selling the property.

Then, after SeneMan had sold the property, it and GTOK—an entity to which SeneGence had assigned its claims against the developers—jointly filed the complaint that initiated this lawsuit.

**B.    Claims and Defenses Alleged in the Pleadings**

The complaint alleged seven claims against the developers.[5] Of these seven claims, one sounded in contract and was alleged only by SeneMan, and six sounded in tort and were alleged by both SeneMan and GTOK. As illustrated below, *each of the seven claims was based on the allegations that the developers had misrepresented, concealed, or failed to disclose material facts.*

**1.    Plaintiffs' Claims Against the Developers**

The claim sounding in contract was for breach of the covenant of good faith and fair dealing in connection with the PSA and was pleaded by SeneMan against Corona. In pleading this claim, the plaintiffs cited the alleged misrepresentations by the developers (see *ante*) and further alleged that "Corona did not tell SeneMan that the Property was graded and the buildings constructed without LEA oversight and approval." Then they alleged that:

> "Corona breached the implied duty of good faith and fair dealing by intentionally making specific false statements to SeneMan about the environmental conditions on the Property and withholding the lack of compliance by Conor and the City regarding the necessary involvement of the

---

[5]    The complaint also named eight other persons, including the City, as defendants. But, because those eight other defendants are no longer parties to the case, we do not concern ourselves with them here.

LEA knowing that these acts and material omissions would induce GTOK's[6] agreement to occupy the Property and manufacture cosmetics and thus, induce SeneMan to close escrow on the Property.

"The false statements and omissions frustrated SeneMan's rights to the benefit of the Agreement which was to lease the Property to GTOK. When the truth was revealed, GTOK backed out of the lease because it could not manufacture its cosmetics and SeneMan was stuck with tenantless buildings that could not be occupied."

The six claims sounding in tort were pleaded in some instances against all three developers and in other instances against just Conor and LaSalle. These claims were for promissory estoppel, fraudulent inducement, intentional misrepresentation, negligent misrepresentation, interference with contractual relations, and interference with prospective economic advantage. Like the contract claim, each of the six tort claims was predicated on the alleged misrepresentations.

Thus, for example, the plaintiffs alleged in support of the promissory estoppel and fraudulent inducement claims that:

"SeneMan expressly told Conor that it would only purchase the Property if it could lease the Property to GTOK to manufacture cosmetic products. Conor knew that GTOK required a contamination free environment, tenant improvements and occupancy certificates.

"In response to GTOK and SeneMan's concerns, Conor promised GTOK and SeneMan, in writing that it was sure there were no longer any environmental issues with the Property and Conor was sure based on their reports, research and communications that GTOK would receive the

<hr>

6      As noted *ante*, the parties use the names SGII, SeneGence, and GTOK interchangeably.

6

necessary approvals from the City to use the Property to manufacture natural cosmetics.

"[¶ . . . ¶]

"The representations were blatantly untrue."

In support of the intentional and negligent misrepresentation claims, the plaintiffs alleged that:

"Conor . . . made material misrepresentations about the status of the environmental concerns with the Property and, further, failed to disclose . . . that [it] . . . had deliberately avoided any disclosures or involvement of the LEA during the grading and construction process of the Project."

And in support of the interference with contractual relations and interference with prospective economic advantage claims, the plaintiffs referenced the lease into which SeneGence had entered with SeneMan and alleged:

– "Conor and LaSalle knowingly and intentionally interfered with the Lease . . . with their misrepresentations[,] causing SeneMan and GTOK to enter into the Lease so that SeneMan would purchase the Property from Conor;"[7]

– "Conor and LaSalle "knowingly and intentionally interfered with the economic relationship [between SeneMan and GTOK by] inducing, with their misrepresentations, SeneMan and GTOK to enter into the Lease so that SeneMan would purchase the Property from Conor; and

– "Conor and LaSalle's misrepresentations were intended to induce SeneMan and GTOK into entering into the Lease with the knowledge that eventually when the truth was

---

7    It is not clear to us how inducing the plaintiffs *to enter into* the lease would have constituted *interference with* the lease.

revealed . . . SeneMan and GTOK's contractual relationship would be disrupted."

In sum, the plaintiffs alleged (in the complaint's introduction) that:

"To ensure the sale to SeneMan, Conor/LaSalle lied about whether the buildings on the Property could be occupied, promising that Certificates of Occupancy would be issued by the City post-closing.  Conor and LaSalle further misled SeneMan by keeping silent about the fact that they, and the City, had graded the Property and constructed the buildings thereon without the appropriate governmental approvals for a former landfill.  Conor, LaSalle and the City knew that what they were doing was illegal, yet did not disclose this to SeneMan, nor to GTOK, the known lessee."

## 2. Developers' Affirmative Defenses

In response to the complaint, the developers filed an answer in which they pleaded several affirmative defenses.  Among these were defenses predicated on a shortened limitations period set forth in the PSA, a release of liability included in the PSA, and an allegation "that the plaintiffs are alter egos of each other."

## C. Developers' Summary Judgment Motion

The developers filed a motion for summary judgment against SeneMan. In this motion they argued that the contract claim was barred by operation of the shortened limitations period and that the six tort claims were barred by operation of the release of liability.

The court granted the motion for summary judgment on both grounds. But, because the motion had been filed against only SeneMan, the fraud claims that the court rejected as to SeneMan survived as to GTOK, and thus remained to be resolved at trial.

**D. Motions to Regulate the Order of Proof at Trial**

**1. Developers' Motion to Bifurcate**

As the trial date approached, the developers filed a motion to bifurcate the trial into two phases: first, a bench trial focused on the alter ego affirmative defense; and second, in the event the court were to rule against them on the alter ego defense, a jury trial to address the remainder of the case.[8] GTOK opposed this motion.

In its opposition brief, GTOK argued that the court had discretion as to the order in which the issues should be tried and that the court should exercise that discretion to deny the motion. In support of this position GTOK argued:

– That, to prevail on an alter ego defense, the developers would have to establish they had "come into court with clean hands;"

– That "legally and factually the issues concerning alter-ego, unclean hands, and a merits trial [on the six tort claims] are intertwined," such that "the same evidence [GTOK would] show at trial regarding Developers' fraud and wrongdoing [would] also be used to show that Developer [had] 'unclean hands;' " and

– That GTOK should be "entitled to present its evidence concerning the unclean hands of Developer at the alter-ego stage of these proceedings if the [m]otion is granted."

---

[8] This was not the developers' first motion to regulate the order of proof at trial. Months earlier, they had filed a motion to split the trial into *three* phases and had indicated in this motion that, during the first of these three phases, they would ask the court to rule that SeneMan and SeneGence "were alter egos [of one another] for purposes of the sale transaction" and that GTOK (as SeneGence's assignee) should thus be bound to the summary judgment ruling. GTOK filed an opposition, and the court denied the motion without prejudice.

In its tentative ruling, the court said it was "inclined to grant the motion to bifurcate the alter ego issue as a bench trial before the commencement of the jury trial," and, in keeping with the tentative ruling, it granted the motion.[9]

## 2. GTOK's Motion to Further Bifurcate

On the day of the trial readiness conference, GTOK filed a trial brief in which it (i) acknowledged that the court had "ordered the case bifurcated to initially proceed as a bench trial on the developers' equitable 'alter-ego' affirmative defense" and (ii) argued that the court should refine its position regarding bifurcation. According to GTOK:

> "The 'alter ego' affirmative defense breaks into two issues: (1) does Developer have requisite 'clean hands' to seek an 'alter ego' equitable remedy; and, if so, (2) is [GTOK] the 'alter ego' of SeneMan.

> "Developer can only proceed into equity if it has 'clean hands.' Consequently, [GTOK]'s assertion of the 'unclean hands' doctrine is a threshold issue that must be adjudicated before the alter-ego affirmative defense."[10]

During the trial readiness conference, the court agreed to include the issue of unclean hands in the alter ego bench trial, and to bifurcate the bench trial, but, as to the sequencing of issues, decided "that the defense would first

---

[9]    GTOK did not argue in its opposition brief that the contemplated order of proof would risk jeopardizing a right to a jury trial. Whether it made such an argument during the hearing is unknown because no transcript of the hearing appears in the record on appeal.

[10]    GTOK also filed on the day of the trial readiness conference a "brief re: order of issues to be adjudicated and proof," in which it similarly argued "that the bifurcated issues relating to Developer's asserted 'alter-ego' remedy should be adjudicated in two phases:  [¶]  Phase 1 – 'Unclean Hands' . . . [¶] Phase 2 – Alter-Ego."

have the burden of proving that there was alter ego, and then only if they've met that burden then [GTOK] could defend [against] that affirmative defense by submitting evidence of unclean hands."

Also at the trial readiness conference the court broached a disagreement between counsel as to how many days should be allotted for the bench trial—five according to the defense, and 10 according to GTOK. In response to a statement by the court that "I don't want everything with regard to the underlying case coming into this portion of the trial,"[11] GTOK's counsel replied, "It's an unavoidable duplication." There then ensued an exchange in which GTOK's counsel indicated that its estimate would likely be revised downward and in which the court assured counsel that the bench trial would not be limited to just five days:

Court: "Based upon the stipulated facts, you should need very little evidence.

Counsel: "Your Honor, yes. And we have been working diligently with the other side on the stipulated facts. And we've also tried to cut the time down by having . . . deposition testimony . . . instead of live witnesses which usually speeds up the process as well. So I think we will be revisiting [the number of hours needed for witness testimony.] But is your Honor going to schedule us for just five days or till we're done?

Court: "You'll go until you're done and other cases will trail behind."

---

[11] Defense counsel had previously informed the court that they anticipated GTOK's damages case would "require at least seven to eight days of lay and expert testimony to unravel."

## E.    Bench Trial

The bench trial lasted seven days.  At its conclusion, the court announced from the bench its determinations:  (1) that GTOK had *not* proven the developers had unclean hands; (2) that the developers *had* proven SeneGence and SeneMan were alter egos of one another; and, as a result, (3) that GTOK should be bound by the order granting summary judgment against SeneMan.

In its remarks from the bench, the court acknowledged "the allegation[s] [that] there [had been] some kind of misrepresentation as to the condition of the property."  Addressing these allegations, the court noted: (1) the absence of any evidence that soil remediation of any kind had occurred at the property subsequent to its sale to SeneMan; (2) testimony of SeneGence/SeneMan executive Bennie Kante[12] "that he never did any soil remediation with regard to this property;" (3) the absence of testimony that any environmental concerns remained with regard to the property; and (4) testimony "that the building is currently occupied."  Then it made a factual finding on the basis of these observations "that the remediation that had been done by Corona JVL was sufficient and that there was no misrepresentation in the representations [the developers had] made pursuant to the sale."

Thereafter, in a 27-page statement of decision, the court added its further findings that the developers had "not conceal[ed] or suppress[ed] any

---

[12]    Kante was the secretary and chief strategy officer of SeneGence.  He also was the treasurer, secretary, and one of two managers of SeneMan.  His wife Joni Rogers-Kante was the CEO of SeneGence and the president and other manager of SeneMan.  Between the two of them, Kante and Rogers-Kante (directly or through trusts) owned and controlled 88 percent of the shares of SeneGence and 100 percent of the membership interests in SeneMan.

material fact," that GTOK had "failed to establish that it was in any way defrauded" by the developers, and that GTOK likewise had failed to establish that the developers had "deceived or intended to deceive the Plaintiffs."[13]

On the basis of these (and other) factual findings and legal conclusions, the court concluded in the penultimate paragraph of its 27-page statement of decision that:

> "Due to the Court's finding of alter ego, each of GTOK's claims is barred by the release in the PSA that the Court enforced against SeneMan's [six tort] claims in its . . . ruling on [the developers'] motion for summary judgment [as to SeneMan]. [E]ach of GTOK's claims consists of the same [six tort] causes of action and relies on the same alleged 'misrepresentations' and 'concealments' as SeneMan's claims. The Court has already held that the PSA's release bars SeneMan from bringing each of these claims as a matter of law. Thus, the Court's finding that SeneGence is a party to the PSA by virtue of its status as alter ego of a signer of the PSA means that GTOK's claims are likewise barred under the same summary judgment ruling."

After issuing its statement of decision, the court entered judgment in favor of the developers and against the plaintiffs. Thereafter, the court issued an amended judgment for the purpose of adding an award of attorney fees and costs.

## F.    Notices of Appeal and Proceedings on Appeal

Between entry of the judgment and entry of the amended judgment, the plaintiffs each (separately) filed a timely appeal. Thereafter, they filed a

---

13    With regard to the allegations pertaining to LEA oversight, the court determined in its statement of decision that the developers had not violated the pertinent regulations because "the LEA had exempted the Property from the requirements of State solid waste laws in the late 1990s and [had] determined that the site no longer needed regulatory oversight."

motion to "expedite SeneMan's appeal and stay . . . GTOK's appeal until SeneMan's appeal can be . . . decided." The second division of this district denied that motion. Then, some months later, the appeal was transferred from the second division to this division, and this division granted an unopposed motion by the plaintiffs to consolidate the two appeals.

## II.
## DISCUSSION

As is evident in the circumstances described above, the trial court in this case exercised its well-established discretion to address equitable issues before legal issues in a bifurcated proceeding.[14] After seven days of trial, it concluded that SeneMan and GTOK were alter egos of one another, and that the developers did not have unclean hands. The plaintiffs do not challenge

---

[14] See *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 317 (*Nationwide*) ["California decisions have . . . repeatedly held that when severable legal and equitable . . . issues are present in a single proceeding, the trial court generally has authority to determine in what order the matters should be heard . . . . [Citation.] And . . . the governing California cases express a preference that the equitable issues be tried first. [Citation.] This general 'equity first preference' is a long standing feature of California law and has always been viewed as fully compatible with the right to jury trial embodied in the California Constitution."]; 3 Witkin, California Evidence (6th ed. 2025) Presentation at Trial, § 63 ["Where a proceeding involves both legal and equitable issues, the normal practice is to try the equitable issues first. [¶] [T]he discretion of the judge to permit the introduction of evidence out of its logical or conventional order is exceedingly broad."]; *Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2017) 8 Cal.App.5th 1, 19–20 (*Rincon I*) [the " 'better practice' is for 'the trial court [to] determine the equitable issues before submitting the legal ones to the jury' "]; Evidence Code, § 320 "[Except as otherwise provided by law, the court in its discretion shall regulate the order of proof."]; *Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 273 ["A trial court has discretion to determine the order in which claims or issues are bifurcated and determined, and the selection and scheduling of those phased determinations will not be disturbed absent an abuse of discretion."].

14

the sufficiency of the evidence as to these findings. Hence we do not disturb these findings on appeal.

As a result of its alter-ego conclusion, the court granted judgment for the developers. This judgment was correct because, in light of the factual findings that there had been no misrepresentations and no concealment or suppression of material facts, there were no further claims remaining to resolve. Indeed, as illustrated above, each of the seven claims against the developers depended on allegations that the developers had misrepresented, concealed and failed to disclose material facts. Yet, the court's findings conclusively to the contrary rendered it impossible for the plaintiffs to succeed in proving any of those seven claims.[15] Consequently, there was *nothing left* for a jury to decide. For this reason, we need not and do not reach the issue of whether the court erred in granting summary judgment against SeneMan.

In an effort to avoid this result, the plaintiffs argue at length that the court erred in granting summary judgment against SeneMan, and then they bootstrap this argument into a series of attacks on the bench trial. But the attacks fall short.

As an example, in one of their attacks on the bench trial, the plaintiffs observe that the statement of decision "relied on" the summary judgment ruling (which they contend is erroneous) to dispose of their claims. This observation is correct, but incomplete. The observation is correct in that, in a

---

[15] Listing the elements of two of the seven claims, the plaintiffs contend the developers have made "no attempt to explain how the *entirety* of plaintiffs' claims are precluded by the factual findings" in the statement of decision. But there was no need for the developers to furnish such an explanation. As discussed above, it is evident that each of the claims the plaintiffs pleaded against the developers depended on allegations of deceptive conduct that the trial court, at the conclusion of the bench trial, rejected.

paragraph appearing on the last page of its 27-page statement of decision, the court invoked its alter ego finding to bind GTOK to the summary judgment ruling. But this overlooks and obscures the fact that the judgment flowed, not just from the summary judgment ruling and that one single paragraph at the conclusion of the statement of decision, but also from more than 20 pages of factual findings *preceding* that paragraph—including of course the factual findings that "*there was no misrepresentation*" and that the developers "*did not conceal or suppress any material fact*" (italics added).)[16] Given these factual findings, the court's reliance on the summary judgment ruling in entering judgment is immaterial.

In another of their attacks on the bench trial, the plaintiffs contend that a party is denied its right to a jury if issues are resolved by the trial court in an equitable proceeding. This is not a correct statement of the law. (See *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 ["It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . , and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury."]; *Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2019) 43 Cal.App.5th 988, 993 (*Rincon II*) [similar]; 7 Witkin, Cal. Procedure (6th ed. 2025) Trial, § 80 ["A

---

[16]    The plaintiffs invoke *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal. App.3d 605, 611-612 (*Clothesrigger*) and *Zak v. State Farm Mutual Liability Insurance Company* (1965) 232 Cal.App.2d 500, 506 (*Zak*) for the proposition that, in cases involving a statement of decision, appellate review should focus not on whether the trial court achieved the right result, no matter the reason, but rather on the reasoning by which the trial court achieved that result. But, in citing these cases for that proposition, they ignore the more than 20 pages of factual findings in the statement of decision that drive its ultimate factual findings that "there was no misrepresentation" and that the developers "did not conceal or suppress any material fact."

court trying the equitable issues first . . . may render the demand for a jury on the legal issues moot."]; *Nationwide, supra,* 9 Cal.5th at p. 317 [California courts' longstanding preference that equitable issues be tried before legal issues "has always been viewed as fully compatible with the right to jury trial embodied in the California Constitution"].)

Attacking the bench trial from another angle, the plaintiffs speculate that, if summary judgment had not been granted, then they would have been afforded an opportunity to present their claims to a jury.  But such speculation is not helpful.  (Cf. *Rincon I, supra,* 8 Cal.App.5th at pp. 19–20 ["declin[ing] to reverse . . . judgment on . . . equitable claims based on [plaintiffs'] speculation that[, had trial court not erroneously denied their jury demand, it] would have departed from the ' "better practice" ' of trying the equitable claims and issues first, . . . [it] would instead have submitted the legal issues to the jury first, and . . . the jury would have made findings favorable to plaintiffs that would have caused the court to reach a different result on the equitable claims"].)  Whether or not the court in the present case might have been inclined to proceed directly to a jury trial in the absence of its summary judgment ruling, the fact remains that it had broad authority to choose to bifurcate the case's equitable issues and that, if as a result of that bifurcation no legal issues remained for trial, no denial of the right to a jury trial can reasonably be said to have occurred.  (See *ante.*)

Attacking the bench trial from yet another angle, the plaintiffs contend it would be error to enforce against SeneMan alter ego findings that resulted from a trial in which the summary judgment ruling prevented it from participating.  But for several reasons, we do not share this view.

17

First, the evidence of a unity of interest between SeneMan and SeneGence was exceedingly powerful. As set forth in the statement of decision:

> "The testimony of Ben Kante demonstrated there was only a very thin veneer of any kind of corporate structure that existed between SeneMan and SeneGence at all.

> "SeneMan and SeneGence are owned, dominated and controlled by Ben Kante and his wife, Joni Rogers-Kante, who collectively own and control 88 percent of SGII, Inc. [i.e., SeneGence] and 100 percent of SeneMan. Joni Rogers-Kante, SeneGence's CEO, owns 88 percent of SeneGence's voting shares and controls all shareholder voting and electing of the board of directors. Ben Kante and Joni Rogers-Kante form a majority of SeneGence's board of directors and are SeneMan's only members.

> "From its formation through close of escrow on June 22, 2017 and thereafter, SeneMan was an undercapitalized shell company that had no employees and used SeneGence employees to perform essential tasks related to the Property. . . . SeneMan had virtually no assets when it entered into the PSA on April 27, 2017. . . . SeneGence was basically using SeneMan for the sole purpose of avoiding any liability with regard to the Property.

> "[¶ . . . ¶]

> "SeneGence held itself out as being liable for SeneMan's financial obligations.

> "[T]here was massive commingling of funds and personal property and disregard of formalities with respect to SeneMan and SeneGence's rights and obligations towards one another. At the time of the purchase and sale transaction, SeneGence was providing SeneMan with gratuitous assistance and payment for obligations that should have been SeneMan's such as . . . free legal services . . . Mr. Kante even testified SeneMan relied on SeneGence's team to manage its due diligence in connection with this transaction. This arrangement was not

18

> formalized in any agreement between SeneMan and SeneGence. . . . A landlord at arms' length with its tenant would not rely on its tenant to conduct its due diligence for the purchase of real property.

> "[T]he leases between SeneMan and SeneGence were not arm's length transactions. Rather than real market value, the monthly rent in the initial lease agreement was based upon what Ben Kante and Joni Rogers-Kante wanted as a rate of return on their investment."

Second, none of these findings are challenged on appeal.

Third, nothing appears in the record—or in the briefs on appeal—to suggest SeneMan might have produced a scintilla of evidence that would have made a difference in the outcome of the trial.

Fourth, SeneMan and GTOK each were represented by the same counsel throughout the proceedings below.

Fifth, one of SeneMan's two managers (Mr. Kante) was present for a substantial portion if not all of the trial.

Sixth, GTOK was an active participant in all aspects of the trial and had the opportunity and incentive to adduce all of the same evidence and arguments that SeneMan could have adduced at trial.

These circumstances satisfy us that SeneMan had sufficient control over the litigation to warrant imposition of the judgment on it. (Cf. *Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 44–46 [affirming imposition of alter ego liability on non-party " 'who has had control of the litigation' "]; *Schoenberg v. Romike Properties* (1967) 251 Cal.App.2d 154, 167–168 [affirming imposition of alter ego liability on non-party appellant, where "[t]here was no showing below, and . . . not the slightest suggestion in the briefs of appellants, that anyone, other than [appellant], had control of the litigation"; and describing authority to do so as "well-settled"]; *Mirabito*

*v. San Francisco Dairy Company* (1935) 8 Cal.App.2d 54, 59 [affirming imposition of alter ego liability on non-party corporate appellant who had partially funded defense in case in which "the attorneys for one corporation were the attorneys for the other and ha[d] at all times acted . . . with the view of protecting [the appellant] upon the basis of the separate identity of the two corporations"; concluding that to hold otherwise "would be to deny respondent the fruits of fairly contested litigation, place a premium upon acts and conduct which have misled a litigant, and frustrate the very purpose of our jurisprudence"].) Accordingly, we conclude it was not error to enforce the alter ego findings against SeneMan.

Attacking the bench trial from a further angle still, the plaintiffs contend they were prejudiced because the court limited GTOK in its presentation of evidence at the bench trial. But, in making this argument, they do not indicate what evidence they were precluded from presenting.

Here, in a seven-day trial, the court afforded GTOK (and, by extension, its alter ego SeneMan) a full opportunity to present evidence regarding key allegations—pertaining to misrepresentations, concealment, and a failure to disclose—that comprised the foundation for each of the claims they had alleged against the developers. The court made detailed and specific factual findings that demolished this foundation, rendering it impossible for them to carry their burden of proof on any of the claims, and thus leaving nothing further to be decided—by a jury or otherwise. Their complaints about the effect of a pretrial ruling do not change this fundamental point.

### III.
### DISPOSITION

The judgment is affirmed.  The developers are entitled to costs on appeal.

KELETY, J.

WE CONCUR:

DO, Acting P. J.

CASTILLO, J.